UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**TOTALCARE HEALTHCARE SERVICES, LLC,**

   Plaintiff,

v.                                                              No. 4:22-CV-0789-P

**TOTALMD, LLC,**

   Defendant.

## OPINION & ORDER

Before the Court is Plaintiff's Motion for Preliminary Injunction. ECF No. 7. For the following reasons, the Court **GRANTS** the Motion.

## FACTUAL & PROCEDURAL BACKGROUND

In 2008, Plaintiff Totalcare Healthcare Services—a family medicine and emergency care company—first used the unregistered mark TOTALCARE in the greater Dallas-Fort Worth area. Ten years later, Defendant Total MD, LLC, an urgent care company historically marketed towards men—started using the mark TOTALCARE for its new brand of urgent care centers in the Austin, Texas area. ECF No. 33 at 30–32. In 2021, Defendant opened a "TotalCare Urgent Care" location on the same street as one of Plaintiff's "Totalcare Family Medicine" locations about half a mile away. Plaintiff sued and now seeks to enjoin Defendant's use of the mark TOTALCARE in specific markets in various North Texas counties. ECF No. 7.

The Court held a preliminary injunction hearing on the matter on October 26, 2022. Plaintiff presented the following evidence.

Plaintiff first called Robert Sek—Defendant's founder and Chief Executive Officer—to the stand. ECF No. 33 at 91—233. Sek stated that Defendant chose the mark TOTALCARE to expand its consumer market

which was traditionally targeted at men under their "TotalMen's" brand. *Id.* at 31–36. Sek elaborated on Defendant's strategy for opening new locations and explained Defendant's plans to expand into the North Texas market. *Id.* at 43. Sek stated multiple times that he did not know of Plaintiff's senior use of the mark in the greater Dallas-Fort Worth area. *Id.* at 58.

Plaintiff next called Drew Valcourt—Defendant's Vice President of Development—to the stand. *Id.* at 65. Valcourt testified that he was previously the Director of Real Estate and Construction. *Id.* at 65—67. After discussing Defendant's methods for acquiring and building new locations, Valcourt also stated that he did not know of any of Plaintiff's similarly named locations at any time before this suit was filed. *Id.* at 88.

Plaintiff's next witness was its founder, Wes Saad, M.D. ECF No. 33 at 92. Dr. Saad discussed the origin of Plaintiff's name and how he intentionally chose it in 2008 because "it would be a more distinctive name, a more memorable name." *Id.* at 95. Dr. Saad discussed how he later combined the two-word mark TOTAL CARE into a single-word mark TOTALCARE after a trademark dispute with another medical care company, CareNow. *Id.* at 96. Dr. Saad noted that at some of their locations, the TOTALCARE logo stands alone with no descriptive text below. *Id.* at 98. Dr. Saad discussed Plaintiff's expansion into new fields—including emergency rooms and behavioral health clinics—in North Texas and the success of the brand's reputation in the community. *Id.* Dr. Saad also discussed instances when THS defended their mark against other companies seeking to use it. *Id.* at 114. Finally, Dr. Saad described his shock and dismay at Defendant's opening of similarly named facilities in the same markets—and even on the same street—as Plaintiff's facilities. *Id.* at 113-16.

Dion Lampe—Plaintiff's Director of Brand Marketing—next took the stand and discussed Plaintiff's marketing efforts in the greater Dallas-Fort Worth area. *Id.* at 140–65. Lampe discussed the intentional and targeted marketing efforts THS makes on a yearly basis to garner goodwill and name recognition in the community. *Id.* These efforts

2

included major sponsorships of Texas Christian University and other universities in the North Texas market. *Id.* at 160–65.

Finally, Stephanie LeBlanc—Plaintiff's current Chief Executive Officer—took the stand. LeBlanc testified about Plaintiff's positive reputation in the community. She testified that individuals have approached her and congratulated her on *Defendant's* "newest facility on Hulen [Street]." *Id.* at 219. Lastly, LeBlanc testified about a recorded call from a customer who was confused over a referral and billing between a "TotalMens Urgent Care" and a "Totalcare Behavioral Care" location. Pl.'s Exhibit 101, ECF No. 33 at 226–27. The individual on the call was confused about the two companies and their related websites and names. *Id.* Further, the caller was frustrated and expressed disappointment with service and billing on multiple fronts. *Id.*

Defendant brought no witnesses to the stand and the motion is thus ripe for the Court's review.

## LEGAL STANDARD

### A. Preliminary Injunction

A preliminary injunction is an "extraordinary remedy" and is granted only if the movant carries its burden on four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The movant must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *City of Dall. v. Delta Airlines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (quotation omitted). "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## ANALYSIS

### A. Likelihood of Success on the Merits

To show a likelihood of success on the merits, a plaintiff must present a prima facie case, but need not prove that it is conclusively entitled to

3

summary judgment. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Before issuing an injunction for trademark infringement, the Court must consider whether: (1) the claimed mark is eligible for protection; (2) the party seeking protection is the mark's senior user; (3) there is a likelihood of confusion between the plaintiff's mark and the defendant's mark; and (4) this likelihood of confusion will cause the plaintiff irreparable injury for which there is no adequate legal remedy. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008).

    1. <u>Whether the mark is eligible for protection</u>

A trademark "is established by use, not by registration." *Union Nat'l Bank of Tex. v. Union Nat'l Bank of Tex.*, 909 F.2d 839, 842 (5th Cir. 1990). Unregistered marks are "governed generally by the same principles that qualify a mark for registration under the Lanham Act." *Bd. Supervisors La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008). Under the Lanham Act, only "distinctive" marks are eligible for protection. *Id.*

To determine the distinctiveness of the mark, courts must determine whether it is "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). In general, the first two categories—generic and descriptive—are not distinctive while the last three categories—suggestive, arbitrary, and fanciful—are distinctive. *Id.* Notably, "[t]hese categories, like the tones in a spectrum, tend to blur at the edges and merge together." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983). Because of the blurry areas that exist in between some categories, "[t]he labels are more advisory than definitional, more like guidelines than pigeonholes." *Id.*

The table below provides a concise overview of the categories:

4

| Category | Examples | Protection |
|---|---|---|
| **Generic** | Bread, Water | Unprotected |
| **Descriptive** | Urgent Care, Bank of Texas, Vision Center | Unprotected |
| **Descriptive with Secondary Meaning** | ChapStick, Xerox | Protected |
| **Suggestive** | Extend Your Beauty, Streamline Production Systems, Coppertone | Protected |
| **Arbitrary** | Apple, Camel, Pixar | Protected |
| **Fanciful** | Google, Exxon, Kleenex | Protected |

Plaintiff contends that TOTALCARE is a suggestive mark. Defendant argues that it is at most a descriptive mark without secondary meaning, and therefore not protected by the Lanham Act. The Court thus focuses its analysis on the first three classifications.

### a. Generic

A generic mark—like "Bread"—is not distinctive because it identifies a common product or service rather than its source. *Zatarains*, 698 F.2d at 790. Defendant argues that TOTALCARE is a generic mark because "it is simply a generic word or phrase generally describing healthcare services." ECF No. 23 at 14. The Court disagrees.

While many healthcare services and products that use the words "total" and "care," (ECF No. 23 at 14–16), there are many businesses that use the mark in drastically different industries—from airplane engines to pet grooming services. ECF No. 29 at 3–4. The nonspecific nature of the mark does not identify a product or a service directly.

Thus, the mark is not generic.

### b. Descriptive

A descriptive mark—like "Urgent Care"—merely describes a characteristic or quality of a product or service, rather than the source of the product or service. *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979). "To be descriptive, a term need only describe the essence of a business, rather than to spell out comprehensively all its adjunct

5

services." *Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1299 (5th Cir. 1985)

Most of the argument at the hearing concerned the role that context plays in determining descriptiveness. Defendant contends that the context in which a mark is advertised determines whether the mark is descriptive. Thus, Defendant contends that because Plaintiff often advertised its TOTALCARE mark alongside the type of services they offer—like "Totalcare Emergency Room" or "Totalcare Behavioral Services"—the mark is descriptive. *See* Def.'s Exhibit 5, ECF No. 33. That is, Defendant asserts that based on the context of Plaintiff's advertising there are *three* marks at issue, not just one. ECF No. 33 at 268. To support its reasoning, Defendant cites two Fifth Circuit cases. *Id.* at 268–73.

In *Xtreme Lashes*, the Fifth Circuit overturned a district court's grant of summary judgment and found that there was a genuine issue of fact as to whether the mark "Extend Your Beauty" was suggestive. 576 F.3d 221, 227 (5th Cir. 2009). In evaluating this mark, the Fifth Circuit held that courts must "examine the context in which a term appears, and the audience to which it is directed" and "look at multi-word marks as a unitary whole . . . not parse apart the constituent terms." *Id.* (quoting *Union Nat'l Bank*, 909 F.2d at 846–47). In applying this context, the court noted that "Extend Your Beauty always appears in conjunction with Xtreme Lashes. Use in this context, may explain the nature of the product, weighing towards descriptiveness." *Id.* Though the court noted that the context of "Extend Your Beauty" next to "Xtreme Lashes" might lend towards descriptiveness, the court found that this was an issue for a jury to decide. *Id.*

Defendant next cites *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017), where the Fifth Circuit upheld a jury's finding that the mark "Streamline Production Systems" was suggestive. After citing *Xtreme Lashes* regarding the use of context for multiword marks, the court noted that the "SPSI logo . . . depicts a piece of natural gas processing equipment [which] might make this connection more explicit." *Id.* Despite placing the exact depiction of a piece of

6

equipment in its logo, the court upheld the jury's ruling that the mark was, at a minimum, suggestive.

Defendant's contentions about the strict application of context are wrong for three reasons. *First*, unlike the marks in *Xtreme Lashes* and *Streamline Production Systems*, the mark at issue is not a multiword mark—it is a single word TOTALCARE. *See* Pl.'s Exhibit 7, ECF No. 33 at 10–11. This mark while evaluated in the context of its advertising is evaluated only as a singular mark: TOTALCARE. Plaintiff's advertising—while identifying its different services below the mark—always maintains a single consistent element: the single-word mark itself. *See* Pl.'s Exhibits 7, 9, 14, 15. Plaintiff also showed instances where the TOTALCARE mark is advertised alone with no additional context. *See* Pl.'s Exhibit 7, ECF No. 33 at 10–11. Further, Plaintiffs in every exhibit shown before the court affixed a trademark symbol after the TOTALCARE mark and before the descriptive advertising of their different services. *See* Pl.'s Exhibits 7, 9, 14, 15, 16, 97, 98.

*Second*, though Defendant is correct that context is important, its narrowly drawn argument—if taken to its logical conclusion—would make advertising any multi-service brand nearly impossible. Based on Defendant's reasoning, any suggestive mark that put "best omelets in town" or "tire shop" in its advertising materials would make the mark descriptive. This would lead to a de facto destruction of suggestive marks unless the brand refused to advertise their products. Given that the dual purpose of trademark protections is "(1) to protect consumers against confusion and monopoly, and (2) to protect the investment of producers in their trade names," this narrow reading of context would destroy the very ability for companies to invest in their trade names through advertising efforts. *Union Nat'l Bank*, 909 F.2d at 843.

*Third*, unlike in *Xtreme Lashes* and *Streamline Production*, this Court is ruling on a preliminary injunction and not entering or contesting a final judgment. As a result, the Court need only find a likelihood of success on the merits. It is well established that "[a] plaintiff is not required to prove its entitlement to summary judgment to establish a substantial likelihood of success on the merits for preliminary injunction purposes." *Byrum v. Landreth*, 566 F.3d 442, 446

7

(5th Cir. 2009) (quotations omitted). Defendant seeks to impose a higher standard of review than is not required at this stage of the case.

In sum, without Defendant's narrow interpretation of context, TOTALCARE does not describe any product, business, industry, or characteristic. Though it may evoke a nebulous quality of service, it is not a word that has a dictionary definition like "speedy," "reliable," "green," or "menthol." *Union Nat'l Bank*, 909 F.2d at 845. This mark is different from marks like "Urgent Care," "Vision Center," or "Bank of Texas" in that what it describes is left up to the imagination and not plain on its face. *See id.*

Thus, the mark is not descriptive.[1]

### c. Suggestive

A suggestive mark—like "KitchenAid"—evokes an attribute of a good or service without describing the attribute, such that the consumer must exercise imagination or thought to determine the nature of the good or service. *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980). To distinguish the gray area between descriptive marks and suggestive marks, courts apply two tests. *First* is the "the imagination test," where courts ask whether a consumer would readily perceive the nature of the mark owner's product or service or whether the consumer would need to make an imaginative leap to do so. *Streamline Prod. Sys., Inc.*, 851 F.3d at 452. *Second,* the "competitor test" considers whether a competitor would need to use the purported mark to describe its product or service. *Zatarains*, 698 F.2d at 792 (asking whether competitors would need the terms used in the trademark to adequately describe their products)

Under the imagination test, TOTALCARE does not immediately evoke urgent or family medical care centers. It may involve healthcare, dental care, pet care, furniture care, car care, lawncare, or a host of other

---

[1] Though the Court does not find an application of secondary meaning necessary, Plaintiff presented evidence of substantial marketing efforts in the greater Dallas-Fort Worth area. *See* ECF No. 33 at 65–91. If this order is appealed and the mark is found to be descriptive by a higher court, Plaintiff has presented enough evidence to make a good-faith showing of secondary meaning. *Id.*

8

services.[2] The imagination test thus lends towards TOTALCARE being a suggestive mark. Without Plaintiff's use of descriptive wording after its mark, it would be difficult to figure out the services it offers.

Under the competitor test, the word "care" is certainly needed to accurately describe a service in the urgent and family care industry. But the combined mark of TOTALCARE is not. Even without using the combined mark, a competitor could operate an urgent care in perpetuity without having to use the word "total" in its marketing efforts.

Thus, TOTALCARE is a suggestive mark and entitled to protection.

2. <u>Whether the party seeking protection is the senior user</u>

Because ownership of a mark is established by use, "[t]he first one to use a mark is . . . the 'senior' user and is entitled to enjoin other 'junior' users from using the mark . . . subject to limits imposed by the senior user's market and natural area of expansion." *Union Nat'l Bank*, 909 F.2d at 842–43. A plaintiff's use of the mark must be continuous to qualify as a senior user. *Paulsson*, 529 F.3d at 309. The industry and natural area of expansion are at issue and other users in different industries or remote locations are irrelevant to a court's analysis. *Id*.

While both parties stipulate that there are other active users of the mark TOTALCARE, the Court's only consideration is whether there are other senior users in both a similar industry and the same geographic territory as Plaintiff. ECF Nos. 23 at 14–16; 29 at 3–4. Defendant does not dispute that Plaintiff is the senior user of TOTALCARE in most counties at issue, but at the hearing, Defendant disputed that it is not the senior user in Dallas County due to another business entity in the County called Totalcare Health Systems PA. ECF No. 33 at 123–25. While this would ordinarily be relevant information, the Court takes judicial notice that Totalcare Health Systems PA's franchise tax status

---

[2] Both Plaintiff and Defendant note that many other businesses in varying industries use the same mark. *See* ECF Nos. 7, 23.

9

was involuntarily ended and there is no longer an entity actively using the name in Dallas County.[3]

### a. Tea-Rose Rectanus

In its briefing, Defendant contends that the *Tea Rose-Rectanus* rule bars Plaintiff from enjoining their use of TOTALCARE because it is a remote junior user of the mark. The Court disagrees.

Unregistered marks are limited to protection in the territory where the mark is known and recognized by potential customers. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415–16, (1916). As a result, the *Tea-Rose Rectanus* rule states that a national senior user of an unregistered mark cannot stop the use of a remote good-faith junior user. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100(1918) ("It would be a perversion of the rule of priority to give it such an application in our broadly extended country that an innocent party . . . might afterwards be prevented from using it . . . at the instance of one who theretofore had employed the same mark, but only in other and remote jurisdictions."); *see also C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 692 (5th Cir. 2001) (rule applied to a senior user in California who entered territory of remote junior user in Houston, Texas). At bottom, the seeks to protect the territorial rights of good-faith users. *C.P. Interests*, 238 F.3d at 692. Each party is entitled to its own exclusive areas of the unregistered trademark's use and, as a result, neither may invade the market area of the other. *Id.*

In asserting the *Tea-Rose Rectanus* rule, Defendant has its role in this conflict reversed. It is a junior remote user from Central Texas who entered the local North Texas territory of a senior user. If Plaintiff sought to enjoin Defendant's use of TOTALCARE in Austin—a remote territory to Plaintiff's senior use—this rule would apply. Yet Plaintiff is seeking to oust Defendant's use of the mark in *Plaintiff's* local territory. The reasoning behind the rule—protecting the territorial rights of users—cuts against Defendant's assertion.

---

[3] Texas Comptroller of Public Accounts, *Totalcare Healthcare, PA*, (November 23, 2022), https://mycpa.cpa.state.tx.us/coa/coaSearchBtn.

10

Thus, the *Tea-Rose Rectanus* rule does not apply, and Plaintiff is the senior user of the mark in the Dallas-Fort Worth area.

3. <u>Whether there is a likelihood of confusion between the marks</u>

In determining the likelihood of confusion element, courts analyze the aptly named "digits of confusion." *Xtreme Lashes*, 576 F.3d at 227. Courts consider eight non-dispositive factors: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *Id.* And like most eight-part multifactor tests, the application of the eight digits ultimately results in a common-sense judgment call. *See Gruma Corp. v. Mexican Rests., Inc.*, 497 F. App'x 392, 395 (5th Cir. 2012) ("No digit is dispositive, and the digits may weigh differently from case to case, depending on the particular facts and circumstances involved."). Obviously, actual confusion is "the best evidence of a likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229. But where a Defendant uses an identical mark "a thorough analysis of the digits of confusion is unnecessary, and a presumption of confusion exists." *See Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 540 (S.D. Tex. 2013) (citing *Paulsson,* 529 F.3d at 310–11).

Though Plaintiff and Defendant both use the identical word mark TOTALCARE, the Court proceeds to analyze the digits of confusion.

a. *Type of trademark*

The first digit of confusion is chiefly concerned with the strength of the mark. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 290 (5th Cir. 2020). To determine the strength of a mark, courts examine: "(1) where the mark falls on a spectrum of categories and (2) the standing of the mark in the marketplace." *Id.* (cleaned up). In determining the standing of the mark in the marketplace, courts consider the extent of third-party usage of similar marks on related products. *Id.* at 289. "Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use

11

with the senior mark user." *Springboards to Edu., Inc. v. Hous. Indep. School Dist.*, 912 F.3d 805, 815 (5th Cir. 2019).

Defendant contends that the pervasive use of TOTALCARE and TOTAL CARE in the healthcare industry makes the mark weak and without strong standing in the marketplace. ECF No. 23 at 28. The Court disagrees for two reasons. *First*, as established above, the mark is suggestive and is entitled to protection. *Second*, Defendant mistakenly applies a national review of the mark's use irrespective of geographic boundaries while the Court is only concerned with the mark's strength in locally disputed markets, *i.e.*, the Dallas-Fort Worth area. *See Union Nat'l Bank*, 909 F.2d at 842–43 (noting that the senior user is "subject to limits imposed by the senior user's market and natural area of expansion").

Thus, the first digit weights towards a likelihood of confusion.

### b. Similarity of the marks

"The similarity of the marks in question is determined by comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998). The appearance of Defendant's mark—though slightly different—is substantially like Plaintiff's. *See* ECF Nos. 7 at 3; 23 at 28. Though Defendant uses green and white lettering, the format is substantially the same with TOTALCARE showcased above the descriptor "Primary Care." *Id.* Below is a photo of the comparison.

 

The sound of the mark is the same as they both say TOTALCARE. *Id.* Importantly, for the modern era—in which business is heavily driven by internet search results—this identical mark is likely to muddy search results for first time or even repeat customers.

12

Additionally, the meaning of the marks is the same. Totalcare—though it has no dictionary meaning—is identical in both uses minus small changes in capitalization. Though Defendant disputes that primary cares are different than family medicine, they are essentially the same thing. ECF No. 33 at 106–109. Regardless of the slight differentiation in color and design the mark at issue is TOTALCARE alone.

The second digit thus weighs towards a likelihood of confusion.

### c. Product similarity

"The greater the similarity between products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch. of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir.1980). Direct competition is not required to find a likelihood of confusion. *Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 669–70 (5th Cir. 1975); *see also Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 666 (5th Cir. 2000) ("The parties do not have to be direct competitors to establish a likelihood of confusion.").

Family medicine and primary care are different words for essentially the same service. ECF No. 29 at 9. Family medicine merely incorporates pediatrics but offers the same services for adults. *Id.* That Plaintiffs also operates an emergency room does not detract from this factor as direct competition is not required to find a likelihood of confusion. *Pro. Golfers*, 514 F.2d at 669–70. Both parties are on the front lines of the medical care industry.

The third digit thus weighs towards a likelihood of confusion.

### d. Outlet and purchaser identity

If consumer bases between the parties overlap, there is a greater likelihood of confusion. *Exxon Corp.*, 628 F.2d at 505. Both parties have the same market and demographic of consumers—people seeking quick and convenient quality healthcare services. *See* ECF No. 33 at 52. That Defendant—who additionally operates a medical care company called "TotalMen's"—added a new TotalCare brand to target a wider audience further proves this point. ECF No. 33 at 52.

13

Thus, the fourth digit weights towards a likelihood of confusion.

### e. Advertising media identity

Where there is a similarity in the streams of advertising and in the types of advertising campaigns, there is a greater the likelihood of confusion. *Exxon Corp.*, 628 F.2d at 506. Defendant admits to using some of the same marketing channels including in person events, social media, and search engine channels. *Compare* ECF No. 1 at 53 *with* ECF No. 13 at 10. Though Plaintiff engages in many more extensive channels of advertising—like sponsoring events at various state and private universities—the advertising channels substantially overlap and encompass the same geographic area.

Thus, the fifth digit weighs towards finding a likelihood of confusion.

### f. Defendant's intent

"Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion." *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). Though the Court notes the proximity of some locations, no evidence offered by Plaintiff reflects malicious intent or freeloading by Defendant. *See* ECF No. 33 at 58–59.

The sixth digit weighs against Plaintiff.

### g. Actual confusion

"Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion." *Streamline Prod. Sys., Inc.*, 851 F.3d at 457. Even minor and isolated incidents of confusion weigh towards finding a likelihood of confusion. *See La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984) (finding that a single incident was enough to establish a likelihood of confusion).

Plaintiff's evidence of actual confusion is sparse, but it presents enough to make this factor weigh in its favor. *See* ECF No. 33 at 182–246. Leblanc testified that customers have approached her and

14

congratulated her on "your newest facility in Hulen," which was Defendant's facility. *Id.* at 219. Plaintiff also presented evidence of a recorded call from a customer who was confused over a referral and billing between a "TotalMen's" and a "Totalcare Behavioral Care" location. Plaintiff's Exhibit 101, ECF No. 33 at 226–227. While confusion was not directly centered on the infringing mark, the individual on the call was confused over the two companies and their related websites and names. *Id.* Most importantly, the individual on the call was frustrated and expressed disappointment with multiple items. *Id.* Because the accrual of goodwill is one of the chief aims of trademark law, a mistaken bad review from a customer in an internet search driven era could be costly for a company. *See Union Nat'l Bank*, 909 F.2d at 843. Though this is not direct evidence of confusion, the fact that an individual was confused between the different networks of related care adds weight to this factor.

Thus, these minor and isolated incidences of confusion are enough to make the seventh digit favor Plaintiff.

### h. *Care exercised by potential purchasers*

Care exercised by consumers in the world of services is different than that of products. This is especially true for healthcare decisions which might come down to a Google search or a snap decision to call your primary care doctor. The confusion might lead repeat patients who wished to return to accidentally go to the wrong clinic. Even worse, confusion might lead to a delay in time sensitive medical decisions. Plaintiff's founder Dr. Wes Saad testified to this issue directly:

> Well, as you know, medicine has an aspect to it that's time sensitive. So, let's say you called Totalcare to leave a message for your doctor. And you say, my blood pressure medicine is not working, could you recommend another medicine, and you wait. And in the meantime, oh, this was the wrong clinic. It could be dangerous in coming to our ER thinking that you're going to an ER to take care of a chest pain, only to end up in a place where they—I don't know what they have, but I doubt they can take care of a chest pain or a heart attack or a stroke. So, I think it could be dangerous.

15

ECF No. 33 at 116. Medical care might be the most sensitive and important field in which consumers make choices. It is thus necessary for their choices to be clear for both times of emergency and times of ordinary care.

Thus, the eighth digit weighs toward Plaintiff.

### i. *A likelihood of confusion exists*

Seven of the eight digits of confusion favor a likelihood of confusion. The Court finds that Plaintiff has proven by clear and convincing evidence that it is likely to succeed in showing that consumers are likely to be confused or deceived by Defendant's use of the TOTALCARE mark. The entire analysis is largely unimportant however as Defendant's use of the word mark—TOTALCARE—is identical to Plaintiff's. Any commonsense individual would find this alone to be confusing when positioned in the same geographic area and in the same or a substantially similar industry. At its very core, this is the type of commonsense analysis that the digits of confusion seek to synthesize.

### 4. Whether the likelihood of confusion will cause irreparable injury

Courts assume irreparable injury where a likelihood of confusion exists. Here likelihood of confusion in the greater Dallas-Fort Worth area is likely, thus the fourth element is met.

## B. Irreparable Injury

The *Lanham Act* states that irreparable injury is presumed in cases of trademark infringement whenever there is a likelihood of confusion. Pub. L. No. 116-260, § 221(a), 134 Stat. 1182, 2208 (December 27, 2020) (amending 15 U.S.C. § 1116(a)); *see also Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) ("All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed."). Even without the presumption of the *Lanham Act*, "[a] plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or

services." *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., LLC*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999).

As exhaustively shown above, a likelihood of confusion exists in this case. Plaintiff's lack control over the actions and qualities of Defendant's services and thus are harmed in their ability to control its goodwill and reputation in the community.

Thus, irreparable injury is met.

### C. Balance of the Equities

Because a preliminary injunction is an extraordinary remedy courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This requires more than a mere cursory analysis. *Id.*

Here, the balance of the equities tips in favor of Plaintiff. Plaintiff is not seeking to stop Defendant from providing competing services—it is merely seeking to stop Defendant from using Plaintiff's mark or confusingly similar variations in the Dallas-Fort Worth area. ECF No. 7 at 10. That said, Defendant asserts that there are major expenses associated with rebranding and changing the name and signage of its locations. ECF No. 33 at 59. Defendant further contends that an injunction would confuse its customers and harm its business in the end. *Id.* While these are important considerations, Plaintiff's burden of losing control of its mark, the potential loss of customers, and the potential harm to its reputation and goodwill are far greater than the cost of changing the branding of a few locations to Defendant. This is the reason the United States of America—through its enactment in the legislature—values and enforces trademark law.

The balance of the equities thus favors granting the injunction.

### D. Public Interest

"The public interest is served whenever state and federal laws are enforced." *Blue Bell Creameries, L.P. v. Denali Co., LLC*, No. CIV.A. H-08-0981, 2008 WL 2965655, at *7 (S.D. Tex. July 31, 2008) (unpublished) (citing *DS Waters of Am., Inc. v. Princess Abita Water, L.L.C.*, 539 F.

17

Supp. 2d 853, 864 (E.D. La. 2008); *Pet Silk, Inc v. Jackson*, 481 F. Supp. 2d 824, 834 (S.D. Tex. 2007)). Beyond enforcing the law, the public interest is directly considered in the purposes behind this country's trademark laws, which are "(1) to protect consumers against confusion and monopoly, and (2) to protect the investment of [businesses] in their trade names." *Union Nat'l Bank*, 909 F.2d at 843; *see also Lakedreams v. Taylor*, 932 F.2d 1103, 1110 (5th Cir. 1991).

Plaintiff's situation falls into these two interest categories. *First*, the public has an interest in preventing confusion to consumers—especially in an industry as sensitive and important as healthcare. *Second*, the public has a strong interest in promoting fair competition in the marketplace, where individuals are certain that their investments into the goodwill of their business are not stolen—whether maliciously or accidentally—by others.

Thus, the public interest favors an injunction.

## CONCLUSION

The Court—having found all elements present to justify a preliminary—hereby **GRANTS** Plaintiff's Motion. ECF No. 7. Defendant—effective immediately and until a final judgment is reached—is enjoined from the following:

1. using "TOTALCARE" or any other confusingly similar variation of it, alone or combined with other words, terms, names, symbols, or devices, as a trademark, service mark, corporate name, trade name component, domain name, or domain name component, or in advertising or signage, or otherwise, to market, advertise, or identify Defendant Total MD, LLC or any of its healthcare services or facilities anywhere in the following North Texas counties: Collin, Dallas, Denton, Ellis, Hunt, Kaufman, Rockwall, Johnson, Parker, Tarrant, and Wise; and
2. from opening any new or additional facilities (or from re-branding or re-naming any existing facilities) using "TOTALCARE" or any confusingly similar variation of it, alone or combined with other words, terms, names, symbols, or devices, as a trademark, service mark, corporate name, trade name component, domain name, or

domain name component, or in advertising or signage, in meta tag data (including, for example, in connection with search engine optimization techniques), or otherwise.

It is also **ORDERED** that Plaintiff must file a proposed preliminary injunction order, conditioned on posting a **$50,000.00** surety bond, no later than **December 1, 2022**. Plaintiff must file an application for a permanent injunction no later than **January 9, 2023**. A hearing on a permanent injunction will be set by the Court at the joint request of the parties upon an agreed date.

It is further **ORDERED** that the parties must mediate with Mr. Dee J. Kelly, Jr. on or before **January 30, 2023.** Within **seven days** after the mediation, the parties will jointly prepare and file a written report, which must be signed by counsel for each party, detailing the date on which the mediation was held, the persons present, and a statement informing the Court of the effect of their mediation and whether this case has been settled by agreement of the parties. The parties shall contact Mr. Dee J. Kelly, Jr. and arrange the details of the mediation on or before **December 9, 2022**.

**SO ORDERED** on this **29th day of November 2022**.

*[Signature: Mark T. Pittman]*

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE